**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| ANDY BERRIOS, | CASE NO. 1:23-cv-00230 |
| Plaintiff, | JUDGE SARA LIOI |
| vs. | MAGISTRATE JUDGE AMANDA M. KNAPP |
| COMMISSIONER OF SOCIAL SECURITY, | **REPORT AND RECOMMENDATION** |
| Defendant. | |

Plaintiff Andy Berrios ("Plaintiff" or "Mr. Berrios") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying his applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI").  (ECF Doc. 1.)  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This matter has been referred to the undersigned Magistrate Judge for a Report and Recommendation pursuant to Local Rule 72.2.  For the reasons explained herein, the undersigned recommends that the Court **AFFIRM** the Commissioner's decision.

## I. Procedural History

Mr. Berrios filed his DIB and SSI applications on October 7, 2020.  (Tr. 21, 245-51, 252-58.)  He alleged a disability onset date of June 15, 2020 (Tr. 21, 245, 252) due to schizophrenia, bilateral carpal tunnel, diabetes, arthritis in hips, and bipolar disorder (Tr. 128, 148, 277).  After initial denial by the state agency (Tr. 124-33) and denial upon reconsideration (Tr. 141-48), Mr. Berrios requested a hearing (Tr. 151).  A telephonic hearing was held before an Administrative Law Judge ("ALJ") on April 13, 2022.  (Tr. 45-83.)  The ALJ issued an unfavorable decision on

1

May 4, 2022, finding Mr. Berrios not disabled.  (Tr. 18-44.)  The Appeals Council denied Mr.

Berrios's request for review of the ALJ's decision on December 7, 2022, making the ALJ's

decision the final decision of the Commissioner.  (Tr. 6-12.)  Mr. Berrios then filed the pending

appeal.  (ECF Doc. 1.)  The matter is fully briefed.  (ECF Docs. 8, 10, 11.)

## II. Evidence

### A. Personal, Educational, and Vocational Evidence

Mr. Berrios was born in 1978.  (Tr. 84, 245.)  He received his GED (Tr. 278) and had

past relevant work as a construction worker, material handler, plastic molder, general laborer in

machine shop, washer, bearing assembler / inspector, and salesperson of communication

equipment.  (Tr. 38, 52-64, 75-78.)  He reported that he stopped working in June 2020 due to

worsening of his medical conditions and "also due to the COVID 19." (Tr. 277.)

### B. Medical Evidence

#### 1. Relevant Treatment History

##### i. Physical Impairments

Mr. Berrios presented to Melissa Acevedo, APRN, CNP, a primary care provider at the

Cleveland Clinic on June 10, 2020, for a checkup regarding diabetes mellitus and left hip pain.

(Tr. 517.)  He reported that his pain started about five days earlier and rated his pain a 9/10 with

no alleviating factors.  (*Id*.)  He reported that he had fallen due to his pain.  (*Id*.)  He described

his pain as sharp, and worse with lifting his left leg and sitting down.  (*Id*.)  He reported that he

had not been compliant with management of his diabetes; he had not taken his medication for a

few weeks because he ran out.  (*Id*.)  On examination, he was disheveled, smelled of oil, and was

irritated, but he was apologetic, and explained he had come from work.  (Tr. 519.)  Examination

of his extremities revealed no deformities, edema, skin discoloration, clubbing, or cyanosis; there

was good capillary refill.  (*Id.*)  His reflexes were normal and symmetric.  (*Id.*)  His left hip was

tender with limited range of motion.  (*Id.*)  His gait was unsteady.  (*Id.*)  He was diagnosed with

acute left hip pain and Type 2 diabetes mellitus.  (*Id.*)  He was provided a prescription for

Toradol for his left hip pain and his diabetes medications were refilled.  (*Id.*)

On July 7, 2020, Mr. Berrios presented to Joseph Scarcella, M.D., F.A.C.S., at the

Cleveland Clinic for an orthopedic consult regarding his bilateral hand numbness and finger

triggering.  (Tr. 513.)  Mr. Berrios reported the problem had been ongoing for six months.  (Tr.

514.)  He reported undergoing EMG testing at Lutheran Medical Center, but the results were not

available for review by Dr. Scarcella.  (Tr. 514, 515.)  Mr. Berrios said he had not tried cortisone

injections.  (Tr. 514.)  He complained that the problems with his hands bothered him throughout

the workday and as he used his hands more.  (*Id.*)  The documented examination findings for his

right hand revealed "[b]aseline sensation normal with a negative Phalen's test," but also

indicated "the right hand show[ed] positive decreased sensation median nerve distribution with a

positive Phalen's test."  (Tr. 515.)  There was "tenderness in the A1 pulley region" of the index

and middle finger, but "no triggering" observed on examination.  (*Id.*)  There was "no tenderness

with palpation [in] the A1 pulley of the left middle or index finger and no triggering."  (*Id.*)

Recent labs reflected an HbA1c level of 8.1.  (*Id.*)  Mr. Berrios was diagnosed with bilateral

carpal tunnel, bilateral index and middle finger triggering, and diabetes. (*Id.*)  Dr. Scarcella

indicated that surgery was not an option due to Mr. Berrios's HbA1c levels.  (*Id.*)  He indicated

that they could proceed with surgery once Mr. Berrios's diabetes was under better control.  (*Id.*)

Mr. Berrios returned to the Cleveland Clinic on July 14, 2020, for an office visit with

Kim Stearns, M.D., regarding his left hip pain.  (Tr. 513.)  He also complained of groin pain.

(*Id.*)  He reported no treatment for his pain other than Neurontin and Aleve. (*Id.*)  He reported no

back or radicular pain.  (*Id*.)  On examination he had "90 [degrees] of hip flexion symmetric to his right side with rotation to 20."  (*Id*.)  There was "mild pain at the extremes of flexion and rotation."  (*Id*.)  Mr. Berrios's straight leg raise testing was negative and his gait was normal. (*Id*.)  Dr. Stearns noted that x-rays were unremarkable, and an MRI showed mild degenerative changes and mild tearing of the labrum.  (*Id*.; *see also* Tr. 538-42.)  Dr. Stearns referred Mr. Berrios for therapy and prescribed Mobic.  (Tr. 513.)

On September 18, 2020, Mr. Berrios presented for a distance health audio encounter telemedicine visit with CNP Acevedo after having been admitted at MetroHealth for mental health treatment.  (Tr. 509-11.)  He admitted he had not been taking his diabetic medication, but agreed to pick up his medication and work on being compliant with management of his diabetes. (Tr. 509-10.)  He reported no other concerns.  (Tr. 510.)

On October 7, 2020, Mr. Berrios presented for a distance health audio encounter telemedicine visit with CNP Acevedo for follow up regarding his blood sugars.  (Tr. 507-09.) He reported that his blood sugar was 184 after breakfast that morning, and that he had just recently started taking his medications.  (*Id*.)  CNP Acevedo reminded Mr. Berrios of the importance of medication compliance and management of his diabetes mellitus and that orthopedics would not proceed with surgery until his blood sugar was under better control.  (*Id*.) CNP Acevedo recommended that Mr. Berrios follow up with endocrinology, and Mr. Berrios agreed.  (Tr. 507, 509.)  She encouraged Mr. Berrios to work on his diet and exercise.  (Tr. 509.)

On October 16, 2020, Mr. Berrios presented to Shirisha Avadhanula, M.D., at Lutheran for a new patient diabetic visit.  (Tr. 503.)  He reported taking metformin 1000 mg twice a day. (Tr. 504.)  He was also prescribed Trulicity 0.75 mg, but was not taking it.  (*Id*.)  He reported that he had never been on insulin.  (*Id*.)  His physical examination was unremarkable.  (Tr. 506.)

4

Mr. Berrios was diagnosed with diabetes mellitus type 2, uncontrolled, and obesity. (*Id*.) His A1c was 7.3, with a goal of 6.5. (*Id*.) He was advised to make modifications to his diet and monitor his blood glucose once a day. (*Id*.) Dr. Avadhanula continued Mr. Berrios on metformin and advised him to start Trulicity. (*Id*.)

### ii. Mental Health Impairments

On August 23, 2019, Mr. Berrios was voluntarily terminated as a psychiatry patient from MetroHealth. (Tr. 432.) He had started treatment at MetroHealth in September 2016 and was treated for bipolar disorder and opioid dependence. (Tr. 432-33.) He was terminated and his case was closed because he failed to attend his appointments. (*Id*.)

About a year later, Mr. Berrios was admitted to a detox center for a week for heroin abuse. (Tr. 372-73.) On August 30, 2020, a week after his discharge from the detox center, Mr. Berrios's sister brought him to MetroHealth's emergency room because of disorganized behavior, agitation, paranoia, and audio / visual hallucinations. (Tr. 370-431, 751-54.) Mr. Berrios's sister reported that his medical history included a history of bipolar disorder, schizophrenia, and polysubstance abuse. (Tr. 372-73, 753-54.) She reported that he ran outside naked, screaming that people were after him, two days earlier. (Tr. 373.) Mr. Berrios was admitted involuntarily to MetroHealth on August 31, 2020. (Tr. 751, 753.) He reported that he was on Depakote in the past and it had helped. (Tr. 753.) He was restarted on Depakote. (*Id*.) He was also started on Risperdal for hallucinations and Trazodone for sleep. (*Id*.) He was discharged home on September 5, 2020. (Tr. 751, 753.) At discharge, he was diagnosed with bipolar disorder, most recent episode manic with psychotic features. (Tr. 370, 751.) On mental status examination, he was cooperative, his affect was full, congruent, and appropriate, and he denied nightmares, hallucinations, and suicidal or homicidal ideation, intent, or plan. (Tr. 753.)

During a pharmacologic telehealth appointment with Margaret Onyeukwu, APRN-CNP, at Metrohealth on September 10, 2020 (Tr. 722-42), Mr. Berrios reported: he was doing "a lot better"; his "mood [was] neutral"; he was "not having bad thoughts"' and he was "not seeing things" (Tr. 723).  He expressed concern regarding what his future meant for him, explaining he was not working and had lost his job because of his hands.  (*Id*.)  He said he was living with his mom.  (Tr. 723-24.)  He said: "I really don't want to stay with them, but this is what I have now."  (Tr. 724.)  Mental status examination findings showed he was cooperative and oriented to time, person, and place.  (Tr. 730.)  His thought process was logical and organized with no evidence of paranoia or delusions.  (*Id*.)  His mood was okay.  (*Id*.)  He exhibited sustained attention and concentration; his memory was within normal limits; and his insight and judgment were fair.  (*Id*.)  CNP Onyeukwu adjusted Mr. Berrios's Risperdal because he reported feeling tired and lazy after taking it in the morning.  (Tr. 731.)  She continued him on Depakote, Trazodone, and Cogentin.  (*Id*.)  He declined CNP Onyeukwu's recommendations for addressing his polysubstance abuse.  (*Id*.)

Mr. Berrios then presented to Nancy Spirakus, LSW, at The Centers for Families and Children ("The Centers") for a telehealth behavioral and mental health case management visit on September 21, 2020.  (Tr. 633.)  He reported he was living in his mother's garage.  (Tr. 634.)  He said he was interested in case management services to assist with applying for SSDI, managing his severe anxiety, helping him follow up with a nutritionist and primary care provider to manage his diabetes and symptoms, and assisting him with finding community resources.  (*Id*.)

Mr. Berrios continued to receive case management services at The Centers every few weeks through December 4, 2020.  (Tr. 608-32.)  During his case management session on December 4, 2020, the benefits of individual counseling were discussed.  (Tr. 609.)  He

6

participated in a telehealth individual counseling session that dame day with Cheryl Gerace, LISW-S at The Centers (Tr. 606-08.)  He continued with individual therapy sessions (Tr. 596-97, 603-05) and case management services at The Centers (Tr. 598-600, 601-02) through the end of that month.  During his December 28, 2020 telehealth counseling session with LISW Gerace, Mr. Berrios presented in a calm and pleasant mood.  (Tr. 596.)  He reported that he was on vacation with his family in Florida.  (*Id*.)  He continued to decline participation in a substance abuse program.  (*Id*.)  He reported using "skills taught by staff and 'his team.'"  (*Id*.)

Mr. Berrios also received mental health services at the end of 2020 through Circle Health Services ("Circle Health").  Mr. Berrios participated in a behavioral health assessment at Circle Health on October 21, 2020, conducted via video by Bonnie Kaput, APRN, CNP.  (Tr. 946-53.) He was diagnosed with: bipolar 1 disorder, depressed; insomnia; opioid abuse, in remission; and cannabis use disorder, moderate.  (Tr. 952.)  CNP Kaput increased Mr. Berrios's Depakote, continued his Risperdal, Cogentin, and Trazodone, and started him on Zoloft.  (*Id*.)

Mr. Berrios had a follow-up telehealth session with CNP Onyeukwu on November 3, 2020. (Tr. 685-90.)  He reported he was "doing good" and did not "feel depressed," but he also reported being anxious, because he was just "sitting . . . doing nothing." (Tr. 687.)  His mental status examination findings were similar to his September 10, 2020 examination findings (*compare* Tr. 687 *with* Tr. 730), except his mood was "worried" (Tr. 687).  No changes were made to his treatment plan.  (Tr. 688.)  He was voluntarily terminated from treatment at his November 3, 2020 session.  (Tr. 688-89.)

Mr. Berrios continued to receive case management, counseling, and medication management services for treatment of his mental health conditions at The Centers and/or Circle

7

Health throughout 2021 and into early 2022. (Tr. 784-900, 978-1049, 1054-1122.)  Mental status examination findings reflected both normal and abnormal findings.  (*Id.*)

For instance, during a telehealth session with CNP Onyeukwu on January 28, 2021 (Tr. 666-75), Mr. Berrios reported he was doing "real good," stating that Zoloft and Depakote were helping (Tr. 668).  CNP Onyeukwu confirmed his earlier desire to voluntarily close his treatment with MetroHealth, and Mr. Berrios reported he was receiving all his mental health treatment from The Center.  (*Id.*)  His mental status examination findings were similar to his November 3, 2020 examination findings (*compare* Tr. 668 *with* Tr. 687), but his mood and judgment and insight were improved (*id.*).  His mood was "stable" as compared to "worried" and his judgment and insight were "good" as compared to "fair."  (*Id.*)  Mr. Berrios was diagnosed with bipolar affective disorder in remission.  (Tr. 670.)  CNP Onyeukwu continued Mr. Berrios's prescriptions for Depakote and Zoloft.  (Tr. 669)

During a telehealth session with CNP Kaput on February 9, 2021, mental status examination findings reflect Mr. Berrios was neat, clean, and appropriately dressed.  (Tr. 871.)  He was cooperative and engaged.  (*Id.*)  His speech was normal.  (*Id.*)  His thought process was goal-directed, linear, and coherent.  (*Id.*)  His mood was euthymic and congruent to mood.  (*Id.*)  He was pleasant with good eye contact.  (*Id.*)  He denied suicidal or homicidal thoughts.  (*Id.*)  His cognition was intact, his insight was good, and his judgment was not impaired.  (*Id.*)

During a telehealth counseling session with LISW Gerace on June 11, 2021, Mr. Berrios appeared irritated and angry with a depressed mood.  (Tr. 1039.)  On July 13, 2021, he appeared neat, clean, and appropriately dressed during a telehealth video session with CNP Kaput.  (Tr. 1028.)  He reported a stable mood with an increased outlook on life on his current medication regimen.  (*Id.*)  He was cooperative and engaged.  (*Id.*)  His speech was normal; his thought

8

process was goal-directed, linear, and coherent; he had no abnormal thought content or perceptual disturbances; his mood was euthymic; and his affect was full and congruent to his mood. (*Id*.) He made good eye contact and was pleasant with no abnormal movements. (*Id*.) He denied suicidal or homicidal thoughts. (*Id*.) His cognition was intact, his insight was good, and his judgment was not impaired. (*Id*.) CNP Kaput continued to prescribe Zoloft (at a decreased dose to minimize reported side effects), Risperdal, Depakote, Trazodone, and Cogentin. (Tr. 1029.) On July 29, 2021, Mr. Berrios presented as pleasant and engaged, but with a depressed mood, during a telehealth counseling session with LISW Gerace. (Tr. 1018.)

During a September 16, 2021 case management visit at The Centers, Mr. Berrios was cooperative and acted appropriately. (Tr. 997-98.) He reported anxiety, but also reported that fishing, medication, and behavioral health therapy services helped him maintain his mental health symptoms. (Tr. 998.) When Mr. Berrios met with Curtis Donald, LPCC, at Circle Health for a telehealth counseling session on September 30, 2021, he reported that things had been very challenging for him. (Tr. 995.) He had been taking care of his terminally ill mother-in-law and also caring for his mother, who had health issues. (*Id*.) Mr. Berrios remained alert and engaged and was receptive to LPPC Donald's suggestions on how to process his thoughts and feelings. (*Id*.) LPCC Donald described Mr. Berrios's mood as neutral. (*Id*.)

At a telehealth counseling session with LPCC Donald on October 14, 2021, Mr. Berrios appeared worried and was overwhelmed. (Tr. 990.) He relayed that his mother-in-law had been moved to hospice. (Tr. 989.) Following the session, he appeared more hopeful. (Tr. 989.) At a session with LPCC Donald on November 7, 2021 (Tr. 1120-21), Mr. Berrios reported that he was continuing to take care of his mother-in-law and was a different person than when he was in active addiction (Tr. 1120). He was alert, engaged, and receptive during the session. (Tr. 1121.)

9

LPCC Donald described Mr. Berrios's mood as neutral.  (*Id*.)  At a session on January 6, 2022 (Tr. 1092-93), he reported that he "had a sober and peaceful New Year" and was "focused on staying sober and living life on life's terms."  (*Id*.)  His mood was described as flat.  (Tr. 1093.)

On January 12, 2022, Mr. Berrios told CNP Kaput during a phone conversation that he felt that his medications were "helping a little too much," saying he felt "sluggish, tired and lazy during the day[.]"  (Tr. 1083.)  He said his mood was stable and he denied anger or irritability. (*Id*.)  CNP Kaput adjusted his medication to address his reported daytime fatigue.  (*Id*.)

At a February 3, 2022 telehealth counseling session with LPCC Donald, he reported that he felt a "little depressed, bored, and sad because his life [was] static as he await[ed] his SSI." (Tr. 1062.)  He was alert and attentive, but LPCC Donald observed a depressed mood.  (*Id*.)

### 2.   Opinion Evidence

#### i.   Physical Impairment Opinion Evidence

##### a.   Treating Source Opinion

On November 30, 2021, Dr. Elbadawy and CNP Acevedo completed a Physical Medical Source Statement.  (Tr. 1050-53.)  They indicated that Mr. Berrios's diagnoses included bilateral carpal tunnel, sciatica, pedal edema, diabetes mellitus, hyperlipidemia, bipolar disorder, anxiety, depression, mood disorder, and osteoarthritis.  (Tr. 1050.)  They opined that Mr. Berrios's prognosis was fair.  (*Id*.)  His reported symptoms included depression, anxiety, bilateral hand pain, fatigue, and back pain.  (*Id*.)  They stated that Mr. Berrios's hand pain was characterized by weak grip strength, tingling, burning, and numbness.  (*Id*.)  His back pain flared up with physical activities.  (*Id*.)  They identified the following as clinical findings and objective signs regarding his hands: positive Tinel's and Phalen's in both hands, weak grip, and inability to make a fist.  (*Id*.)  They stated he was depressed "due to health and minimal daily activity." (*Id*.)

They also reported that Mr. Berrios was seeing a mental health provider for depression, anxiety, and bipolar and mood disorder. (*Id*.)

They opined: Mr. Berrios could sit or stand for thirty minutes at a time; he could sit for less than two hours total in an eight-hour workday; he could stand/walk for less than two hours total in an eight-hour workday; he would need to walk around every thirty minutes in an eight-hour workday, for ten minutes each time; he would need to take unscheduled breaks two to three times each day for ten to fifteen minutes at a time due to muscle weakness, chronic fatigue, and pain / paresthesias, numbness; he would have to elevate his legs to heart level for 10% of the workday due to swelling/edema. (Tr. 1051-52.) They also opined: Mr. Berrios could lift and carry ten pounds frequently and twenty pounds occasionally, and he could never lift or carry fifty pounds; he could use his fingers and hands 20% of the workday; he would likely be off task 20% of the workday; he was capable of low-stress work; he would have "good days" and "bad days"; and he would likely be absent from work about two days per month. (Tr. 1052-53.)

### b.     Consultative Examiner's Opinion

Mr. Berrios presented to Dariush Saghafi, M.D., for a physical consultative examination on January 21, 2021. (Tr. 638-46.) Mr. Berrios's chief complaint was: "Hands don't let me do anything[.]" (Tr. 639.) He said that he started having weakness in his hands in February 2020, with his right hand worse than his left. (*Id*.) He described sharp pain in both hands. (*Id*.) He also reported the following conditions: schizophrenia, bipolar disorder, carpal tunnel in both hands, diabetes, and arthritis in his hips. (*Id*.) He reported the following medications: metformin, Depakote, Zoloft, glipizide, Risperdal, and pravastatin. (*Id*.)

On examination, Mr. Berrios was in no acute distress and was alert and oriented to person, place, and time. (Tr. 640.) Mr. Berrios's speech was fluent; he was articulate and able to

comprehend everything.  (*Id.*)  He had no difficulty with calculation.  (*Id.*)  His short-term memory at five minutes for three objects was normal and his repetition and naming were intact.  (*Id.*)  His motor examination was normal with full strength and normal range of motion in the upper and lower extremities, with the exception of abnormal grasp and pinch ability on the right.  (Tr. 640-41, 643-45.)  His sensation was intact to light touch bilaterally and his deep tendinous reflexes were +2/4 in the upper and lower extremities.  (Tr. 641.)  Phalen, Romberg, and Babinski signs were absent.  (*Id.*)  Hoover signs were negative bilaterally.  (*Id.*)  Tinel signs were positive on the left and absent on the right.  (*Id.*)  Mr. Berrios's gait was normal, with no predisposition to falls, and his arm swing was normal.  (*Id.*)

Dr. Saghafi's impression was that Mr. Berrios likely had symptoms and physical signs consistent with left carpal tunnel syndrome that was mild to moderate in severity.  (Tr. 641.)  Dr. Saghafi found "no evidence clinically of a median neuropathy on the right side."  (*Id.*)  He stated that Mr. Berrios suffered from poorly controlled diabetes.  (*Id.*)  He opined that Mr. Berrios could "lift, push, and pull sufficiently to be able to perform ADL's and lift and carry up to 25 lbs."  (*Id.*)  He opined that Mr. Berrios could "bend, walk, and stand up to 10 min[utes] before the left hip begins bothering him."  (*Id.*)  He also opined that Mr. Berrios could: "understand the environment as well as peers and communicate satisfactorily[]" and "travel independently."  (*Id.*)

### c.      State Agency Medical Consultants' Opinions

On initial review on January 26, 2021, state agency medical consultant Leslie Green, M.D., found that Mr. Berrios had no severe physical impairment.  (Tr. 88, 95.)  On reconsideration on July 11, 2021, state agency medical consultant Leon Hughes, M.D., found that Mr. Berrios had severe physical impairments.  (Tr. 105, 116.)  Dr. Hughes completed a

Physical RFC Assessment, opining that Mr. Berrios had the following physical residual functional capacity:

- occasionally lift and/or carry fifty pounds and frequently lift and/or carry twenty-five pounds;

- stand and/or walk about six hours in an eight-hour workday;

- sit about six hours in an eight-hour workday;

- frequent use of hand controls with bilateral upper extremities;

- occasional climbing ladders, ropes, and scaffolds;

- frequent stooping, kneeling, crouching, crawling, and climbing ramps or stairs; and

- frequent handling, fingering, and feeling with bilateral upper extremities.

(Tr. 108-09, 119-20.)

### ii.    Mental Health Impairment Opinion Evidence

### a.    Consultative Psychologist's Opinion

Mr. Berrios presented to psychologist Herschel Pickholtz, Ed.D., for a psychological consultative evaluation on March 4, 2021.[1]  (Tr. 769-79.)  When Dr. Pickholtz asked Mr. Berrios what prevented him from working, Mr. Berrios said: "Right hand and can't make a fist due to pinched nerve and had carpal tunnel in both hands."  (Tr. 771.)  Mr. Berrios reported that he had been taking psychiatric medications prescribed by a psychiatrist since late 2020 and he was attending counseling every week over the phone.  (Tr. 772, 775.)  Mr. Berrios said that he experienced minimal affective symptoms with psychiatric medications, indicating that his symptoms over the prior six months included depression, mild manic symptoms, mild anxiety, and visual and auditory hallucinations.  (Tr. 772-73, 775.)

---

[1] Dr. Pickholtz's opinion is dated March 16, 2021.  (Tr. 779.)

On mental status examination, Dr. Pickholtz observed that Mr. Berrios was dressed neatly and appropriately.  (Tr. 774.)  He was compliant with consistent and appropriate eye contact during the evaluation.  (*Id*.)  His "responses during the clinical interview ranged between the upper end of the low average to the lower end of the average ranges [and] . . . his responses during the cognitive section of the evaluation fell within the borderline to low average ranges." (*Id*.)  Mr. Berrios's voice appeared "just a little bit sad at times[,]" but he was "fairly easily understood and intelligible."  (*Id*.)  "His verbalizations were logical, coherent, relevant, and goal directed."  (*Id*.)  Mr. Berrios reported "some mild psychotic symptoms."  (*Id*.)  Dr. Pickholtz observed "no signs of any internalized stimulation or psychotic processing[.]"  (*Id*.)  Dr. Pickholtz found Mr. Berrios's "overall capacities for associative thinking and cognitive levels of functioning ranged between the lower end of the average to the upper end of the borderline ranges."  (*Id*.)  Dr. Pickholtz could not observe Mr. Berrios's facial expressions because he was wearing a mask, but he observed that Mr. Berrios's "overall affect appeared to be slightly constricted and [his] mood appeared to be slightly depressed."  (Tr. 775.)  Dr. Pickholtz observed no signs of agitation, hostility, mood swings, or autonomic activity.  (*Id*.)  Based on Mr. Berrios's "responses to mental status operations and the descriptions of his daily living activities," Dr. Pickholtz estimated that Mr. Berrios's intelligence level "fell within the borderline to low average ranges."  (Tr. 775-76.)

With respect to daily activities, Mr. Berrios reported that he took care of his personal needs and hygiene.  (Tr. 776.)  He reported that he performed minimal household chores, shoveled snow, and took out the garbage.  (*Id*.)  He shopped for food twice a month and for clothes once a month.  (*Id*.)  He used the internet three hours each day and his hobbies included watching television and going on YouTube and social media sites.  (*Id*.)  He spent about four

14

hours each day playing video games.  (*Id*.)  He reported minimal impairment in his ability to remember and understand television programming or written materials.  (*Id*.)  He was usually home alone during the day, but spent time with his girlfriend and her children in the evenings, going to the park and thrift stores, eating, watching television, and playing games.  (*Id*.)  He babysat his girlfriend's children, ages 15, 13, and 11, for three hours three times per week, and reported he had a good relationship with them.  (*Id*.)  He talked to relatives who lived out of state three times per week, and talked and texted with friends twice per month.  (*Id*.)

Dr. Pickholtz diagnosed Mr. Berrios with: unspecified mood disorder, mostly depressed with mild psychotic symptoms in partial remission, currently mild, exacerbated by drugs in the past; other mixed substance use disorder with large amounts in recent remission; cannabis use disorder, currently mild; and unspecified personality disorder related to addictive and antisocial features.  (Tr. 778.)  Dr. Pickholtz opined that Mr. Berrios would not be able to independently monitor benefits if granted.  (Tr. 776, 779.)

Dr. Pickholtz opined that Mr. Berrios's "overall capacities to understand, remember, and carry out instructions for simple work activities based upon his daily activities [did] not reflect any impairment" and his "capacities to understand, remember, and carry out more complex work activities suggest[ed] a slight impairment at worst."  (Tr. 778.)  He also opined that: Mr. Berrios's "capacities for attention and concentration . . . fell in the borderline to low average and low average ranges[]"; "[h]is pace appeared to be just a little bit slow at times"; and "his persistence was just a little bit impaired[]."  (*Id*.)  He opined that Mr. Berrios's abilities "to perform 1 to 2 step tasks really [did] not reflect any significant impairment [and] [h]is abilities to perform 3 to 4 step tasks suggest[ed] a slight impairment at worst."  (*Id*.)  Dr. Pickholtz opined that Mr. Berrios had "a slight impairment at worst[]" in his abilities and limitations in responding

to supervision and coworkers in a work setting.  (*Id.*)  Dr. Pickholtz opined that Mr. Berrios had

"a slight impairment at worst[]" in his abilities and limitations in responding to work pressures in

a work setting provided he remained sober from using illegal substances.[2] (*Id.*)

### b.  State Agency Psychological Consultants' Opinions

On March 18, 2021, state agency psychological consultant Robyn Murry-Hoffman,

Psy.D., found on initial review that Mr. Berrios had no severe physical impairments.  (Tr. 89-90,

96-97.)  On June 24, 2021, state agency psychological consultant Akanksha Dutt, Psy.D., found

on reconsideration that Mr. Berrios had severe mental impairments. (Tr. 105, 116.)  Dr. Dutt

completed a Psychiatric Review Technique (Tr. 105-06, 116-17) and a Mental RFC Assessment

(Tr. 109-11, 120-22), opining that Mr. Berrios:

- had no limitations in understanding and memory;

- would have minimal limitations "at worst" in persistence and concentration;

- could perform work in a non-public setting with occasional interaction with supervisors and coworkers for work-related tasks and could perform work in a setting where this is no close or over-the-shoulder scrutiny and where feedback provided is constructive and supportive; and

- could adapt and manage himself in a structured and predictable work setting where major changes are explained and he is provided time to adjust to new expectations.

(*Id.*)

### C.  Hearing Testimony

### 1.  Plaintiff's Testimony

Mr. Berrios testified in response to questioning by the ALJ and his representative at the

April 13, 2022 telephonic hearing.  (Tr. 52-75.)  He provided testimony regarding his past work

experience.  (Tr. 52-64.)  While he was at his most recent job, he said his "hands started to hurt

---

[2] Dr. Pickholtz noted that Mr. Berrios was using "mild amounts of marijuana at the . . . time."  (Tr. 779.)

really bad and [he] couldn't even lift up the parts . . . and then [his] hips didn't want [him] to stand up that long either." (Tr. 63.) His employer tried to work with him and allow him time to get his hand "fixed[,]" but he eventually ended up losing his job because there were no positions available for the work he was able to perform. (Tr. 63-64.)

Mr. Berrios explained that his hand problems were primarily in his right, non-dominant hand. (Tr. 64.) He said he could not hold on to a coffee cup or carry a bag of groceries because it caused him pain and "hurt[] too much." (Tr. 64-65.) He said he initially had a tingling sensation in his hand and eventually he would be unable to hold something in his hand or make a fist. (Tr. 65.) He felt he was putting strain on his left hand because he was using it all the time due to the problems with his right hand. (Tr. 65-66.) He said he had not had surgery on his hands because his doctor had told him he needed to bring down his sugar levels, and he had not done that. (Tr. 73.) He said it was hard for him because he did not cook his own food, stating that he had to eat what his mom and girlfriend made for him. (Tr. 73-74.)

Mr. Berrios also reported problems in his lower extremities. (Tr. 66.) He complained of pain and swelling in both legs and numbness and tingling in his hips and right thigh. (*Id*.) The swelling in his legs was between his knee and hip. (Tr. 67.) He tried wearing compression type sweatpants, but that did not help; lying down and elevating his legs did provide him some relief. (*Id*.) He estimated that he elevated his legs at least two hours each day. (Tr. 67-68.) He estimated being able to stand for about two hours before becoming uncomfortable. (Tr. 68.) He said that the more he walked, the worse he felt; he estimated he could walk about thirty minutes. (*Id*.) He said that no one had suggested treatment for issues with his hips. (Tr. 73.)

Mr. Berrios discussed his mental health conditions. (Tr. 69-73.) He said he spent most days lying down because his medication made him drowsy, and he could not concentrate or

focus.  (Tr. 68.)  He also said his medication made him "droopy like" and caused him to be depressed at times, only wanting to sleep.  (Tr. 68, 71.)  He estimated he got six hours of restful sleep once he fell asleep, but had problems falling asleep and slept for several hours during the day.  (Tr. 69-70.)  He lacked motivation to do things, reporting that he went a couple of days without showering and needed reminders to take his medication.  (Tr. 71-72.)  He did not have problems getting along with other people, but did not like being around other people.  (Tr. 72.)  Since his mental health hospital admission in 2020, he only smoked marijuana.  (Tr. 74-75.)

### 2.    Vocational Expert's Testimony

A Vocational Expert ("VE") testified at the hearing.  (Tr. 75-82.)  He classified Mr. Berrios's past relevant work[3] as: (1) bearing assembler inspector, a light, semi-skilled position; (2) general laborer, machine shop, a heavy, unskilled position performed at medium to heavy exertion; (3) washer of plastics, a medium, unskilled position; (4) material handler, a heavy, semi-skilled position performed at light to medium exertion; (5) plastic molder, a light, unskilled position; (6) construction worker II, a very heavy, unskilled position performed at medium exertion; and (7) salesperson of communication equipment, a light, skilled position.  (Tr. 75-78.)

The VE further testified that an individual with the functional limitations described in the ALJ's RFC determination (Tr. 25, 78-79), could perform Mr. Berrios's prior work as a bearing assembler inspector, plastic molder, and washer as actually and customarily performed, and could perform Mr. Berrios's prior work as a general machine shop laborer and a construction worker as actually performed.  (Tr. 79.)  The VE testified that all competitive work would be eliminated if the individual would: need to elevate his legs to heart level, be absent three days per month, or be off-task 20% of the workday.  (Tr. 81-82.)

---

[3] Except as specified, the VE testified that the identified jobs were performed by Mr. Berrios at the same exertional level described in the DOT.

### III.     Standard for Disability

Under the Social Security Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[.]

42 U.S.C. § 423(d)(2)(A).

To make a determination of disability under this definition, an ALJ must follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1.     If the claimant is doing substantial gainful activity, he is not disabled.

2.     If the claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.     If the claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, the claimant is presumed disabled without further inquiry.

4.     If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if the claimant's impairment prevents him from doing past relevant work.  If the claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.     If the claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. § 404.1520, 416.920;.[4] *see also Bowen v. Yuckert*, 482 U.S. 137, 140–42 (1987).

Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.

*Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the

Commissioner at Step Five to establish whether the claimant has the Residual Functional

Capacity ("RFC") and vocational factors to perform other work available in the national

economy.  *Id.*

## IV.    The ALJ's Decision

In her May 4, 2022, decision, the ALJ made the following findings:[5]

1.    The claimant meets the insured status requirements of the Social Security
      Act through June 30, 2022. (Tr. 23.)

2.    The claimant has not engaged in substantial gainful activity since June 15,
      2020, the alleged onset day.  (*Id*.)

3.    The claimant has the following severe impairments: bilateral carpal tunnel
      syndrome, diabetes mellitus, osteoarthritis of the bilateral hips, obesity,
      bipolar disorder, mood disorder, and personality disorder.  (Tr. 24.)  The
      claimant has the following non-severe impairment: history of substance
      use disorders.  (*Id*.)

4.    The claimant does not have an impairment or combination of impairments
      that meets or medically equals the severity of the listed impairments in 20
      C.F.R. Part 404, Subpart P, Appendix 1.  (Tr. 24-27.)

5.    The claimant has the residual functional capacity to perform medium work
      as defined in 20 CFR 404.1567(c), except he can frequently use his hands
      for hand controls; occasionally climb ladders, ropes, scaffolds; frequently
      climb ramps and stairs; frequently stoop, kneel, crouch, and crawl;
      frequently handle, finger, and feel bilaterally; can interact with coworkers
      and supervisors to engage in brief, work-related tasks, such as asking
      questions, clarifying instructions, gathering information, pointing or
      directing where items may be placed, and serving; no conflict resolution,

---

[4] The DIB and SSI regulations cited herein are generally identical.  Accordingly, for convenience, in most instances, citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 et seq.  The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds with 20 C.F.R. § 416.920).

[5] The ALJ's findings are summarized.

so no customer service type work, and no directing the work of others; can adjust to routine type changes in the work environment.  (Tr. 27-37.)

6.  The claimant is capable of performing past relevant work as a plastic molder, washer, and bearing inspector as generally performed and as performed by claimant, and capable of performing past relevant work as construction worker and laborer machinist as performed by claimant. (Tr. 37-38.) This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity.  (*Id.*)

Based on the above, the ALJ found Mr. Berrios was not under a disability, as defined in the Social Security Act, from June 15, 2020, through the date of the decision.  (Tr. 39.)

## V.    Plaintiff's Arguments

Mr. Berrios argues first that the ALJ erred when she failed to find Mr. Berrios's treating provider's opinion persuasive and failed to include limitations from that opinion in the RFC. (ECF Doc. 8, pp. 1, 7-11; ECF Doc. 11.)  He argues second that the ALJ erred when she found at Step Four that Mr. Berrios could perform his past relevant work.  (ECF Doc. 8, pp. 1, ,11-15.)

## VI.    Law & Analysis

### A.    Standard of Review

A reviewing court must affirm the Commissioner's conclusions absent a determination that she failed to apply the correct legal standards or made findings of fact unsupported by substantial evidence in the record.  *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 405 (6th Cir. 2009) ("Our review of the ALJ's decision is limited to whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence.").

When assessing whether there is substantial evidence to support the ALJ's decision, the Court may consider evidence not referenced by the ALJ.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as

21

adequate to support a conclusion." *Besaw v. Sec'y of Health & Hum. Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989)). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). "'The substantial-evidence standard ... presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.'" *Blakley*, 581 F.3d at 406 (quoting *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)). Therefore, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). Even if substantial evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

Although an ALJ decision may be supported by substantial evidence, the Sixth Circuit has explained that the "'decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007) (citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-547 (6th Cir. 2004))). A decision will also not be upheld where the Commissioner's reasoning does not "build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)).

**B.  First Assignment of Error: Whether ALJ Properly Evaluated Persuasiveness of Joint Opinion of Plaintiff's Treating Sources, Dr. Elbadawy and CNP Acevedo**

Mr. Berrios argues that the ALJ erred when she concluded that the November 2021 medial source statement of his treating providers, Dr. Elbadawy and CNP Acevedo (Tr. 1050-53), was not fully persuasive and accordingly failed to incorporate the limitations from that opinion into the RFC (ECF Doc. 8, pp. 1, 7-11; ECF Doc. 11).  The Commissioner responds that the ALJ discussed supportability and consistency, as required by the regulations, and that her analysis of those factors was supported by substantial evidence.  (ECF Doc. 10, pp. 8-10.)

**1.  Legal Framework for Evaluation of Medical Opinion Evidence**

The Social Security Administration's ("SSA") regulations for evaluating medical opinion evidence require ALJs to evaluate the "persuasiveness" of medical opinions "using the factors listed in paragraphs (c)(1) through (c)(5)" of the regulation.  20 C.F.R. § 404.1520c(a); *see Jones v. Comm'r of Soc. Sec.*, No. 3:19-CV-01102, 2020 WL 1703735, at *2 (N.D. Ohio Apr. 8, 2020). The five factors to be considered are supportability, consistency, relationship with the claimant, specialization, and other factors.  20 C.F.R. § 404.1520c(c)(1)-(5).  The most important factors are supportability and consistency.  20 C.F.R. §§ 404.1520c(a), 404.1520c(b)(2).  ALJs must explain how they considered consistency and supportability, but need not explain how they considered the other factors.  20 C.F.R. § 404.1520c(b)(2).

As to supportability, the regulations state: "The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be."  20 C.F.R. § 404.1520c(c)(1).  In other words, "supportability" is the extent to which a medical source's own objective findings and supporting explanations substantiate or support the findings in the opinion.

As to consistency, the regulations state: "The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be."  20 C.F.R. § 404.1520c(c)(2).  In other words, "consistency" is the extent to which a medical source's opinion findings are consistent with evidence from other medical and nonmedical sources in the record.

The undersigned turns to whether the ALJ's evaluation of the challenged medical opinion satisfied the regulatory framework for evaluation of medical opinion evidence.

### 2.     Whether ALJ Properly Evaluated Treating Providers' Opinion

The ALJ evaluated the persuasiveness of the opinion as follows:

The record contains an opinion rendered by Emad Elbadawy, M.D., cosigned by primary care provider Melissa Acevedo, CNP, dated November 30, 2021, indicating the claimant can sit 30 minutes at a time, stand 30 minutes at a time, sit less than 2 hours total, and stand/walk less than 2 hours total (Exhibit 11F). They opined the claimant needs to walk around during an 8 hour workday for 10 minutes every 30 minutes, and requires unscheduled 10-15 minute breaks 2 to 3 times a day (*Id*.). The claimant's providers opined he needs to elevate legs to heart level 10% of the workday (*Id*.). They opined the claimant can lift/carry 10 pounds frequently, 20 pounds occasionally, and 50 pounds never (*Id*.). Dr. Elbadawy and Ms. Acevedo opined the claimant can grasp, turn, twist objects and perform fine manipulation 20% bilaterally, and can reach in front of the body and overhead 100% bilaterally (*Id*.). They concluded the claimant would be off task 20% of the time, is capable of low stress work, is likely to have good and bad days, and will be absent about 2 days per month (*Id*.). In support of their opinion, Dr. Elbadawy and Ms. Acevedo noted bipolar disorder, depression, bilateral carpal tunnel syndrome, sciatica, diabetes mellitus, hyperlipidemia, mood disorder, pedal edema, neuropathy, obstructive sleep apnea, and fatigue, with pain, weak hand grip, decreased sensation to light touch, and inability to make a fist (*Id*.). This opinion is not fully persuasive for several reasons. First, the opinion is inadequately supported because despite the symptoms and examination findings noted therein, there is no discussion of abnormalities on diagnostic imaging/testing, or impaired range of motion, coordination, or gait on examination to support the rather extreme limitations contained therein (*Id*.). In addition, the opinion is not entirely consistent with the remaining of evidence of record, which includes examination findings of positive Tinel's and Phalen's, occasionally decreased right hand sensation, occasional left hip tenderness and limited range of motion, and an occasionally unsteady gait, but

otherwise normal range of motion, full strength, normal pulses, otherwise intact sensation, and a generally normal gait with consistently independent ambulation (Exhibit 1F, 2F, 4F, 5F, 7F). <u>Because the record as a whole confirms the claimant is less limited, the opinion of Dr. Elbadawy and Ms. Acevedo is not fully persuasive.</u>

(Tr. 36-37 (emphasis added).)

Mr. Berrios does not dispute that the ALJ considered supportability and consistency. Instead, he argues the ALJ's persuasiveness finding "was in error and was not supported by substantial evidence." (ECF Doc. 8, p. 9.) More specifically, he argues "[t]he medical evidence documents that treatment by Dr. Elbadawy and the certified nurse practitioner were consistent with and supported their opinion" (*id.*), highlighting the following evidence:

- A June 10, 2020 primary care examination noting tenderness and limited range of motion in his left hip (*id.* (citing Tr. 519));

- A July 2, 2020 MRI showing degenerative changes in both hips with acetabular labral tearing (*id.* (citing Tr. 538-42));

- Dr. Scarcella's July 7, 2020 orthopedic examination, which "revealed bilateral numbness and tingling in his hands" (*id.* (citing Tr. 514));

- A positive Phalen's test in the right upper extremity (*id.* (citing Tr. 515));

- Evidence that he was told in October 2020 that he could not have surgery until his blood sugars were under better control (*id.* at pp. 9-10 (citing Tr. 507));

- His report of blurred vision relating to his diabetes (*id.* at p. 10 (citing Tr. 505));

- Dr. Saghafi's January 2021 physical examination, which noted abnormal grasp and pinch with the right hand (*id.* (citing Tr. 643)); and

- His subjective complaints in July 2021 regarding difficulty working with his hands due to peripheral neuropathy and carpal tunnel (*id.* (citing Tr. 1026)).

He further argues that the opinion was supported by and consistent with other medical opinions, including the opinion of state agency reviewing physician Dr. Hughes that he was capable of limited handling, fingering, and feeling and the opinion of consultative examiner Dr. Saghafi that his symptoms and physical signs were consistent with carpal tunnel syndrome and poorly

controlled diabetes, and that he could lift up to twenty-five pounds and bend, walk, and stand for ten minutes before his left hip would start bothering him.  (*Id*. (citing Tr. 108-09, 119-20, 641).)

As an initial matter, the undersigned notes that Mr. Berrios's arguments that the medical evidence was "consistent with and supported" the relevant opinion (ECF Doc. 8, p. 9) and that the opinion "was further supported by and consistent with" other medical opinions (*id.* at p. 10), do not state the applicable legal standard.  Even if a preponderance of the evidence supports a finding that the opinion was persuasive, this Court cannot overturn the ALJ's finding to the contrary "so long as substantial evidence also support[ed] the conclusion reached by the ALJ." *Jones*, 336 F.3d at 477; *Blakley*, 581 F.3d at 406.

The questions before this Court, as Mr. Berrios ultimately acknowledges (ECF Doc. 8, p. 10), are whether the ALJ considered the full record in evaluating the persuasiveness of the opinion, appropriately articulated her reasons for finding the opinion unpersuasive, and made a determination that was supported by substantial evidence.  *See* 20 C.F.R. § 404.1520c (governing how ALJs consider and articulate findings regarding medical opinions); 20 C.F.R. § 404.1520(e) (findings regarding RFCs will be "based on all the relevant medical and other evidence" in the case record); *see also Blakley*, 581 F.3d at 405 ("Our review of the ALJ's decision is limited to whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence.").

The undersigned therefore considers whether the medical evidence, subjective reports, and medical opinions highlighted by Mr. Berrios reveal that the ALJ failed to consider the entire record, failed to sufficiently articulate her reasoning, or lacked substantial evidence to support her finding that the medical opinion in question was "not fully persuasive."  (Tr. 37.)

26

First, a review of the ALJ decision reveals that she addressed the following medical evidence, relevant to the issues highlighted in Mr. Berrios's brief (ECF Doc. 8, pp. 9-10):

- Subjective complaints of hand pain, tingling, and difficulty using his hands (Tr. 28);

- Dr. Scarella's determination that Mr. Berrios must bring down his sugars / obtain better diabetic control before undergoing surgery (Tr. 28, 29);

- Results of Mr. Berrios's July 2020 MRI (Tr. 29);

- Examination findings of left hip tenderness and limited range of motion (*id.*); and

- Abnormal examination findings regarding Mr. Berrios's right hand, as detailed by Dr. Scarella in his July 2020 treatment records (*id.*).

Although the ALJ did not specifically note Mr. Berrios's October 2020 report of blurred vision relating to diabetes, she did note his noncompliance with diabetic diet and medications and also observed that his October 2020 diabetic eye exam found no diabetic retinopathy.  (Tr. 29.)  The ALJ also did not address the notation of an "abnormal" grasp and pinch in the right hand on Dr. Saghafi's neuromusculoskeletal data sheet (Tr. 643) but did note his positive Tinel sign on the left (Tr. 641).  It is observed that the abnormal grasp and pinch findings on the right were not noted in Dr. Saghafi's report (Tr. 639-41) and Dr. Saghafi ultimately found "physical signs consistent with a LEFT [carpal tunnel syndrome]" but "no evidence clinically of a median neuropathy on the right side" (Tr. 641).

The ALJ also considered the medical opinion of state agency medical consultant Dr. Hughes, who opined that Mr. Berrios should be limited to frequent hand controls, handling, fingering, and feeling due to his carpal tunnel syndrome.  (Tr. 35; *see* Tr. 108-09, 199-20.)  In fact, the ALJ found the opinion persuasive and adopted those limitations into the RFC.  (Tr. 27, 35.)  The ALJ also considered Dr. Saghafi's physical examination findings (Tr. 29-30) and medical opinion (Tr. 26).  However, she found Dr. Saghafi's opinions as to Mr. Berrios's ability

to lift, carry, bend, walk, and stand were "not persuasive" because they appeared to be based on subjective reports and were contrary to his own examination findings and other evidence.[6]  (*Id.*)

The ALJ need not discuss every piece of evidence to render a decision supported by substantial evidence.  *See Boseley v. Comm'r of Soc. Sec. Admin.*, 397 F. App'x 195, 199 (6th Cir. 2010) (citing *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 507–08 (6th Cir. 2006) (per curiam)).  For the reasons discussed above, the undersigned finds the ALJ appropriately considered and addressed the medical evidence and opinions highlighted in Mr. Berrios's brief, and that Mr. Berrios has not shown that the ALJ failed to consider the entire record in making her persuasiveness finding.

Mr. Berrios also argues that the ALJ relied on an "incorrect rationale" in support of her persuasiveness finding.  (ECF Doc. 8, p. 10.)  Based on her review of the record, the ALJ found the objective medical evidence did not "fully corroborate . . . [Mr. Berrios]'s allegations" (Tr. 28) and that the record confirmed Mr. Berrios "is less limited" than the opinion of Dr. Elbadawy and CNP Acevedo suggests, so that their opinion is "not fully persuasive" (Tr. 36-37).  In so finding, she discussed both the "supportability" and the "consistency" of that opinion.  (Tr. 37.)

As to supportability, *see* 20 C.F.R. § 404.1520c(c)(1), the ALJ acknowledged that the opinion identified some symptoms and examination findings in support, but observed there was "no discussion of abnormalities on diagnostic imaging/testing, or impaired range of motion, coordination, or gait on examination to support the rather extreme limitations contained therein." (Tr. 37 (emphasis added).)  Mr. Berrios offers no specific argument as to how this rationale is inaccurate in the context of the treatment records and/or supporting explanations of Dr.

---

[6] Mr. Berrios has not adequately developed an argument that the ALJ erred in analyzing the persuasiveness of Dr. Saghafi's opinion, and any such argument is waived.  *See McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997) ("Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.").

Elbadawy or CNP Acevedo, who cited only clinical findings relating to Mr. Berrios's hands in support of their opinions, for example, that Mr. Berrios has significant limitations in his ability to sit, stand, and walk and would be required to elevate his legs.  (Tr. 1050-53.)  The undersigned finds Mr. Berrios has not shown that the ALJ failed to sufficiently articulate her reasoning as to the supportability of the relevant medical opinion.

As to consistency, *see* 20 C.F.R. § 404.1520c(c)(2), the ALJ found that the opinion was "not entirely consistent with the remaining of evidence of record."  (Tr. 37.)  Specifically, she acknowledged that the record included "examination findings of positive Tinel's and Phalen's, occasionally decreased right hand sensation, occasional left hip tenderness and limited range of motion, and an occasionally unsteady gait," but noted in contrast that the examination findings also showed "normal range of motion, full strength, normal pulses, otherwise intact sensation, and a generally normal gait with consistently independent ambulation."  (Tr. 37.)  Other than pointing to the abnormal examination findings and reported symptoms already discussed above (ECF Doc. 8, pp. 9-10), Mr. Berrios does not offer a specific argument as to how the ALJ's rationale was inaccurate in the context of the evidence of record, and the undersigned finds Mr. Berrios has not shown that the ALJ failed to sufficiently articulate her reasoning as to the consistency of the medical opinion.

Indeed, an independent review of the record supports the ALJ's explanation.  For instance, when Mr. Berrios presented to Dr. Stearns at the Cleveland Clinic on July 14, 2020, complaining of left hip pain, his straight leg raise testing was negative and his gait was normal.  (Tr. 513.)  When Mr. Berrios presented to Dr. Avadhanula on October 16, 2020, for a new patient diabetic visit, his physical examination was unremarkable.  (Tr. 503, 506.)  When he presented to Dr. Saghafi for his consultative evaluation on January 21, 2021, his motor

examination was normal with full strength and normal range of motion in the upper and lower extremities, except for abnormal grasp and pinch on the right.  (Tr. 640-41, 643-45.)  His sensation was intact to light touch bilaterally and his deep tendinous reflexes were +2/4 in the upper and lower extremities.  (Tr. 641.)  Phalen, Romberg, and Babinski signs were absent.  (*Id*.)  Hoover signs were negative bilaterally.  (*Id*.)  Tinel signs were positive on the left and absent on the right.  (*Id*.)  His gait was normal with no predisposition to falls and his arm swing was normal.  (*Id*.)  While the record included some abnormal imagery and physical examination findings, Dr. Hughes found that evidence to be consistent with an ability to perform medium exertional work with some additional limitations.  (Tr. 35.)

For the reasons stated above, the undersigned finds Mr. Berrios has not met his burden to show that the ALJ failed to consider the entire record when evaluating the persuasiveness of the medical opinion, that she failed to sufficiently articulate her reasons for finding the opinion "not fully persuasive," or that her persuasiveness finding lacked the support of substantial evidence.  Accordingly, the undersigned finds the first assignment of error to be without merit.

## C.    Second Assignment of Error:  Whether ALJ Erred When Concluding at Step Four That Plaintiff Could Perform His Past Relevant Work

In his second assignment of error, Mr. Berrios argues that the ALJ erred when she concluded at Step Four that Mr. Berrios could perform his past relevant work.  (ECF Doc. 8, pp. 1, ,11-15.)  The Commissioner responds that Mr. Berrios's argument is without merit.  (ECF Doc. 10, pp. 10-12.)  He contends that Plaintiff "purports to challenge the ALJ's step-four finding[,]" but his "real argument is a hodgepodge of arguments that the RFC should have included additional limitations[]" and he relies "on evidence the ALJ found unconvincing" and is simply a "request[] to reweigh the evidence, which should be rejected."  (*Id*. at p. 10.)

1.      **Step Four Legal Framework**

The burden at Step Four of the sequential evaluation process rests with the claimant to establish that he cannot perform past relevant work in light of his RFC.  *See* 20 C.F.R. § 404.1520(a)(iv); *Walters*, 127 F.3d at 529; *Velazquez v. Comm'r of Soc. Sec.*, No. 1:19-CV-2474, 2020 WL 9258393, at *14 (N.D. Ohio Oct. 8, 2020), *report and recommendation adopted,* No. 1:19-CV-2474, 2021 WL 836913 (N.D. Ohio Mar. 5, 2021).  Assessing a claimant's RFC is a necessary component of determining at Step Four whether a claimant can perform his past relevant work because the RFC assessment is used "at the fourth step of the sequential evaluation process to determine if [a claimant] can do [his] past relevant work[.]"  20 C.F.R. § 404.1520(e); *see also Velazquez*, 2020 WL 9258393, at *14 ("The ALJ's RFC finding is a vital component of the Step Four prior-work evaluation") (citing 20 C.F.R. §§ 404.1520(e), 416.920(e)).

A claimant's RFC "is the most [he] can still do despite [his] limitations."  20 C.F.R. § 404.1545(a)(1).  An ALJ is charged with assessing a claimant's RFC "based on all the relevant evidence in [the] case record."  *Id.*; *see also* 20 C.F.R. § 404.1546(c) "(If your case is at the administrative law judge hearing level . . ., the administrative law judge . . . is responsible for assessing your residual functional capacity.");  *Poe v. Comm'r of Soc. Sec.*, 342 Fed. App'x 149, 157 (6th Cir. 2009) ("The responsibility for determining a claimant's residual functional capacity rests with the ALJ, not a physician.").

Once the ALJ has assessed the claimant's RFC, the ALJ at Step Four of the sequential evaluation process compares the RFC assessment "with the physical and mental demands of [the claimant's] past relevant work."  20 C.F.R. § 404.1520(f); *see also* 20 C.F.R. §§ 404.1560(b), 404.1545(a)(5)(i); *Walters*, 127 F.3d at 529 (explaining that "Step Four necessarily entails a comparison of the physical demands of the claimant's past relevant work with his present mental

and physical capacity[]") (internal citations and alterations omitted); *see also Velazquez*, 2020 WL 9258393, at *14.  As part of the Step Four determination, "[a] vocational expert . . . may offer relevant evidence . . . concerning the physical and mental demands of a claimant's past relevant work, either as the claimant actually performed it or as generally performed in the national economy[,]" which may be helpful to the ALJ in "supplementing or evaluating the accuracy of the claimant's description of his past work."  20 C.F.R. § 404.1560(b)(2). Additionally, "[a] vocational expert . . . may offer expert opinion testimony in response to a hypothetical question about whether a person with the physical and mental limitations imposed by the claimant's medical impairment(s) can meet the demands of the claimant's previous work, either as the claimant actually performed it or as generally performed in the national economy." *Id.*  If the ALJ determines that the claimant can perform his past relevant work, he will be found not disabled at Step Four.  20 C.F.R. § 404.1520(f); 20 C.F.R. § 404.1560(b)(3).  A denial of a claimant's "disability claim at Step Four is proper if there is substantial evidence in the record to support the conclusion that [the claimant] could perform his past relevant work and had therefore failed to make a prima facie case of being under a disability."  *Walters*, 127 F.3d at 529.

### 2.    ALJ's RFC Assessment and Step Four Determination

As part of her Step Four analysis, the ALJ found that Mr. Berrios had the RFC to:

> perform medium work . . .  except he can frequently use his hands for hand controls; occasionally climb ladders, ropes, scaffolds; frequently climb ramps and stairs; frequently stoop, kneel, crouch, and crawl; frequently handle, finger, and feel bilaterally; can interact with coworkers and supervisors to engage in brief, work related tasks, such as asking questions, clarifying instructions, gathering information, pointing or directing where items may be placed, and serving; no conflict resolution, so no customer service type work, and no directing the work of others; can adjust to routine type changes in the work environment.

(Tr. 27.)  The ALJ also found that Mr. Berrios had the following past relevant work: construction worker II; material handler; plastic molder; general laborer, machine shop; washer;

bearing assembler / inspector; and salesperson communication equipment.  (Tr. 38.)  After considering the VE testimony, the ALJ concluded that the claimant could perform his past relevant work as a plastic molder, washer, and bearing inspector as actually and generally performed, and his past relevant work as construction worker and laborer machinist as actually performed.  (Tr. 37-38.)  The ALJ found this work did not require the performance of work-related activities precluded by the claimant's residual functional capacity.  (*Id*.)  Thus, the ALJ concluded at Step Four that Mr. Berrios was not disabled.  (Tr. 38-39.)

While Mr. Berrios's second assignment of error is captioned as a challenge to the ALJ's finding that Mr. Berrios could perform past relevant work, the essence of his argument is that the ALJ erred at Step Four because her finding that Mr. Berrios could perform his past relevant work was based on an RFC determination that was not supported by substantial evidence.  (ECF Doc. 8, pp. 11-15.)  He does not contend that the ALJ failed to compare his RFC with the physical and mental demands of his past relevant work or improperly considered or relied on vocational expert testimony at Step Four.  Instead, he argues that the ALJ should have included additional mental and physical limitations in the RFC that would have resulted in a finding of disability. (*Id*. at pp. 14-15.)  These arguments will be addressed in turn.

### i.    Whether Additional Mental RFC Limitations Were Warranted

First, Mr. Berrios argues that the evidence supports state agency psychological consultant Dr. Dutt's June 24, 2021 opinion that Mr. Berrios has the capacity to participate in "only occasional interactions with supervisors and co-workers with no close over the shoulder scrutiny and where feedback would be constructive and supportive."[7]  (ECF Doc. 8, p. 13 (citing Tr. 110,

---

[7] Mr. Berrios also asserts that "evidence submitted after the State Agency review in June 2021 evidenced further psychological limitations."  (ECF Doc. 8, p. 13.)  However, he does not identify what those "further psychological limitations" are or should be.  (*Id*.)  He only recites mental health treatment-related evidence.  (*Id*. at pp. 13-14.) The undersigned finds this underdeveloped argument to be waived.  *See McPherson*, 125 F.3d at 995–96.

121).) But an ALJ "is not required to recite the medical opinion of a physician verbatim in [her] residual functional capacity finding." *Poe*, 342 Fed. App'x at 157. Here, the ALJ considered and evaluated Dr. Dutt's opinion, but found it not persuasive, explaining:

> State disability determination services psychological consultant Akanksha Dutt, Psy.D., opined on June 24, 2021 that the claimant will be able to work in a non-public setting with occasional interaction with supervisors and coworkers for work related tasks, will be able to work in a setting where there is no close over the shoulder scrutiny and where the feedback provided is constructive and supportive, and will be able to adapt and manage himself in a structured and predictable work setting, where major changes are explained and he is given time to adjust to new expectations []. <u>This opinion, which is couched in non-vocationally relevant and non-policy compliant terms is not persuasive for several reasons</u>. <u>First, the opinion is inadequately supported</u> as the evidence of a generally stable and/or euthymic mood, often full affect, good eye contact, normal thoughts, with no overt psychosis, and at least fair insight and judgment on recent mental status examinations cited therein contract [*sic*] some of the restrictive social interaction limitations set forth by Dr. Dutt []. <u>In addition, the opinion is inconsistent with the remaining evidence of record</u>, including subsequent mental health treatment notes, which contain reports of improved symptoms on medications, and findings of appropriate, cooperative, engaged, calm, pleasant behavior, good eye contact, intact hygiene and grooming, normal speech and thoughts, and often good insight and judgment on subsequent mental status examinations []. For these reasons, Dr. Dutt's opinion is not persuasive.

(Tr. 35 (citations omitted) (emphasis added).) Mr. Berrios has neither argued nor shown that the ALJ failed to properly evaluate the persuasiveness of Dr. Dutt's opinion,[8] and no such error is apparent. Further, even though the ALJ found Dr. Dutt's opinion was not persuasive, she found that the record did support some limitations in Mr. Berrios's ability to interact with supervisors and coworkers, in that he could only "interact with coworkers and supervisors to engage in brief, work related tasks." (Tr. 27.) In making this finding, the ALJ imposed greater interaction limitations than those suggested by state agency psychological consultant Dr. Murry-Hoffman— who found Mr. Berrios's mental impairments non-severe (Tr. 35)—or psychological consultative examiner Dr. Pickholtz—who found Mr. Berrios had no more than "slight" mental impairments

---

[8] Any such argument was not sufficiently developed and is waived. *See McPherson*, 125 F.3d at 995–96.

(Tr. 36).  Mr. Berrios has failed to show that the ALJ erred when she did not adopt the specific interaction limitations in Dr. Dutt's opinion, and has also failed to show that the ALJ otherwise failed to adequately account for his limitations in the ability to interact with others.

Second, Mr. Berrios appears to suggest that the ALJ should have limited him to simple work, arguing: "Although the vocational witness was not asked the effect of being limited to simple work, Plaintiff's past work as a material handler, bearing assembler, and salesperson were all semi-skilled or skilled occupations."  (ECF Doc. 8, p. 14.)  This argument was insufficiently developed and may be deemed waived.  *See McPherson*, 125 F.3d at 995–96.  But it is also clear that Mr. Berrios failed to show that the ALJ erred in considering the evidence relating to his mental impairments or adopted a mental RFC that lacked the support of substantial evidence.

The ALJ considered Mr. Berrios's mental health treatment records in detail (Tr. 30-31), and then explained:

> As shown above, the claimant also experiences symptoms associated with bipolar disorder, mood disorder, and personality disorder that would reasonably interfere with his ability to interact with others and tolerate a stressful work environment []. Although the claimant has been alert, oriented, and able to maintain sufficient concentration to participate in mental status examination, he has been agitated and angry, with a depressed, anxious, agitated, irritable, tired, flat, and/or worried mood, a labile and/or constricted affect, occasionally restless motor behavior, and decreased insight and judgment []. As a result, the undersigned finds the claimant can interact with coworkers and supervisors to engage in brief, work related tasks, such as asking questions, clarifying instructions, gathering information, pointing or directing where items may be placed, and serving, with no conflict resolution, so no customer service type work, and no directing the work of others, and can adjust to routine type changes in the work environment. However, greater limitations, including a restriction to unskilled work, are not warranted, as the claimant has been alert and oriented on examination, with intact hygiene and grooming, generally cooperative, pleasant, engaged behavior, generally intact attention and concentration, generally normal memory, and generally normal speech and thoughts, with no overt anxiety or psychosis on recent examinations []. Thus, additional mental restrictions are not appropriate.

(Tr. 32 (citations omitted) (emphasis added).)  Thus, the ALJ clearly explained her reasoning for not including a restriction to unskilled work.  Mr. Berrios's general citation to medical evidence relating to his mental health treatment (ECF Doc. 8, p. 13) is insufficient to demonstrate that the ALJ's finding lacked the support of substantial evidence, and this Court cannot overturn that finding "so long as substantial evidence also support[ed] the conclusion reached by the ALJ." *Jones*, 336 F.3d at 477; *Blakley*, 581 F.3d at 406.  Thus, Mr. Berrios has failed to establish that the ALJ's mental RFC lacked the support of substantial evidence, and the undersigned finds that the ALJ's thoroughly explained reasoning for the mental limitations in the RFC provides an accurate and logical bridge between the evidence and the RFC.

Additionally, the undersigned observes that four of the five[9] jobs the ALJ found Mr. Berrios could perform are classified as unskilled: construction worker II, plastic molder, laborer, and washer.  (Tr. 38.)  Only one of those jobs was classified as semi-skilled.  (*Id.*)  Thus, even if a restriction to unskilled work were required by the evidence, Mr. Berrios has not explained how the ALJ's Step Four finding loses the support of substantial evidence where she found Mr. Berrios could perform four unskilled jobs under the relevant RFC.  (*Id.*)

Third, Mr. Berrios argues his own subjective statements support more restrictive mental RFC limitations than those found by the ALJ.  (ECF Doc. 8, p. 14.)  Specifically, he points to his testimony that: his medication made him drowsy and unmotivated; he needed medication reminders; at times, he forgot to take medication or take care of his hygiene; and he had trouble sleeping at night and would be sleepy during the day when he took his medication.  (*Id.*)  This recitation of subjective complaints lacks developed argumentation, such that Mr. Berrios has waived any argument that the ALJ erred in finding his "statements concerning the intensity,

---

[9] Mr. Berrios incorrectly says the ALJ found he could perform all of his past relevant work (ECF Doc. 8, p. 12), when the ALJ found instead that he could perform five of his past seven jobs (Tr. 38).

persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record" (Tr. 28).  *See McPherson*, 125 F.3d at 995–96.

The undersigned nevertheless observes that the ALJ thoroughly explained her rationale for finding Mr. Berrios's subjective statements not entirely consistent with the record.  (Tr. 32-33.)  She explained that "[m]edical and mental health treatment notes contained in the record indicate far more extensive activities than indicated by the claimant and his mother[,]" noting for instance: "in December 2020, the claimant reported a recent vacation in Florida with family members" and "[i]n September 2021, the claimant reported . . . taking care of family members, including his terminally ill mother in law and mother with health issues."  (Tr. 33.)

The ALJ also found that Mr. Berrios's receipt of unemployment benefits during the relevant period was inconsistent with his allegations that his symptoms were totally disabling, explaining: "in order to obtain unemployment compensation, a claimant is required to tell the state that he is able and willing to work, and he is looking for work."  (*Id*.)  As the Sixth Circuit observed, "[a]pplications for unemployment and disability benefits are inherently inconsistent." *Workman v. Comm'r of Soc. Sec.*, 105 F. App'x 794, 801–02 (6th Cir. 2004); *see also Ralston v. Comm'r of Soc. Sec. Admin.*, No. 1:13CV1307, 2014 WL 3828431, at *10 (N.D. Ohio Aug. 4, 2014) (finding "the ALJ did not err by considering [the claimant's] testimony relating to his work and unemployment benefits as a factor in his credibility analysis[]").

The ALJ also considered Mr. Berrios's "scope of treatment" when she evaluated the consistency of his subjective statements with the evidence of record, finding that Mr. Berrios's mental health treatment was "largely conservative."  (Tr. 33-34.)  In sum, the ALJ found:

> The claimant has alleged numerous complaints in support of his application for disability, and the record does support some limitations due to his symptoms and allegations. However, when considering the claimant's testimony in light of the limited, conservative treatment record and the mainly mild to moderate

> examination findings, the claimant's impairments are not as debilitating as he has alleged. The allegations of disability made by the claimant are therefore not entirely consistent with the evidence.

(Tr. 34.)  Given this analysis, the undersigned finds that, even if Mr. Berrios had sufficiently raised a challenge to the ALJ's evaluation of his subjective allegations, he has not demonstrated that the ALJ erred in her evaluation of his subjective complaints.

In sum, Mr. Berrios has failed to show that the ALJ erred at Step Four of the sequential analysis by not including more restrictive mental RFC limitations.

### ii.    Whether Additional Physical RFC Limitations Were Warranted

Mr. Berrios also argues that the ALJ should have included the following additional physical limitations in the RFC: (1) a limitation to occasional handling and fingering and (2) a requirement to elevate his legs during the workday.  (ECF Doc. 8, pp. 14-15.)  To the extent Mr. Berrios relies on the arguments from his first assignment of error to support this line of reasoning (*id*. at p. 12), the undersigned finds the argument lacks merit for the reasons set forth in Section VI.B.2., *supra*.  The ALJ did not err in finding the opinion of Dr. Elbadawy and CNP Acevedo "not fully persuasive" and was not required to adopt those providers' opined limitations as to Mr. Berrios's ability to use his upper extremities or his need to elevate his legs.  The ALJ considered the physical examination findings regarding Mr. Berrios's right upper extremity and the MRI findings for his hips (Tr. 29-30) that are highlighted in Mr. Berrios's brief (ECF Doc. 8, p. 12) and found the medical opinion of Dr. Hughes persuasive as to the limitations resulting from those physical impairments (Tr. 35).  Mr. Berrios has failed to demonstrate that the ALJ erred in not adopting greater limitations, and has failed to show that the physical RFC adopted by the ALJ lacked the support of substantial evidence.

Mr. Berrios also appears to argue that his own subjective statements support a more restrictive physical RFC than that adopted by the ALJ. (ECF Doc. 8, p. 14.) He points to his testimony that: he was left hand dominant with problems mostly in his right hand; he could not hold onto a cup of coffee or a bag of groceries due to pain, numbness, and tingling; he had pain in his hips with numbness in his right thigh; his right side was more swollen than his left with the swelling between his knee and his hip; he felt better when he laid down and elevated his legs; he elevated his legs at least two hours a day; the more he walked, the sorer his leg felt; and he could walk only half an hour. (*Id.*) As with Mr. Berrios's subjective mental complaints, his recitation of subjective physical complaints lacks developed argumentation, and he waived any argument that the ALJ erred in finding his subjective statements "not entirely consistent with the medical evidence and other evidence in the record" (Tr. 28). *See McPherson*, 125 F.3d at 995–96.

The undersigned nevertheless observes that the ALJ thoroughly explained her rationale for finding Mr. Berrios's subjective statements not entirely consistent with the record by: describing activities of daily living that "detract from his allegations of totally debilitating" impairments; noting his receipt of unemployment benefits; and observing that the record showed only "very limited, conservative medical treatment, consisting of the use of oral medications" with "[p]hysical examinations and diagnostic imaging [that] have revealed mild to moderate abnormalities at most." (Tr. 33-34.) Thus, even if Mr. Berrios sufficiently raised a challenge to the ALJ's evaluation of his subjective allegations, he has not demonstrated that the ALJ erred in her evaluation of his subjective physical complaints.

In sum, Mr. Berrios has failed to show that the ALJ erred at Step Four of the sequential analysis by not including more restrictive physical RFC limitations.

For the reasons discussed above, Mr. Berrios has not met his burden to show that the RFC adopted by the ALJ lacked the support of substantial evidence and the undersigned finds no merit to the argument that the ALJ erred in finding Mr. Berrios could perform his past relevant work. Under the five-step sequential evaluation process, "[i]f the claimant is found to be conclusively disabled or not disabled at any step, the inquiry ends at that step." *Rabbers*, 582 F.3d at 652 (citing 20 C.F.R. § 404.1520(a)).  Thus, the disability inquiry ended with the ALJ's sufficiently articulated and properly supported conclusion at Step Four that Mr. Berrios was not disabled because he could perform his past relevant work.  Accordingly, the undersigned finds the second assignment of error to be without merit.

## VII.    Recommendation

For the foregoing reasons, the undersigned recommends that the Court **AFFIRM** the Commissioner's decision.

January 16, 2024

/s/Amanda M. Knapp
AMANDA M. KNAPP
United States Magistrate Judge

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document.  Failure to file objections within the specified time may forfeit the right to appeal the District Court's order.  *See Berkshire v. Beauvais*, 928 F.3d 520, 530 (6th Cir. 2019); *see also Thomas v. Arn*, 474 U.S. 140 (1985).